IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria

KWAME YEBOAH-KANKAM          )
                            )
        Plaintiff,          )
                            )
    v.                      )          1:17-cv-549 (LMB/JFA)
                            )
PRINCE WILLIAM COUNTY       )
SCHOOL BOARD,               )
                            )
        Defendant.          )

<u>MEMORANDUM OPINION</u>

Before the Court is defendant Prince William County School Board's ("defendant" or

"PWCPS") Motion for Summary Judgment [Dkt. No. 31] to which plaintiff Kwame Yeboah-

Kankam ("plaintiff" or "Yeboah-Kankam"), proceeding <u>pro se</u>, has filed a response. Based on

the written materials, the Court finds that oral argument would not aid the decisional process. For

the reasons stated below, defendant's motion will be granted.

## I.          BACKGROUND

The uncontested facts establish that plaintiff, who is an African-American male originally

from Ghana, West Africa, was hired as a counselor at Freedom High School ("Freedom") in

August 2013. Joint Stipulated Uncontested Facts ("Stip. Facts") ¶ 2 [Dkt. No. 26]. He was hired

by Inez Bryant ("Bryant"), Freedom's principal, and Dave Anderson ("Anderson"), Freedom's

Director of Counselling. <u>Id.</u> ¶¶ 3, 5. Plaintiff reported directly to Anderson for two years, until

Anderson was replaced by Brianna Moore ("Moore") during the 2015-2016 school year. <u>Id.</u> ¶ 7.

Plaintiff also reported to Bryant, in her capacity as Freedom's principal, and to Mickey Mulgrew

("Mulgrew"), PWCPS' Associate Superintendent for High Schools. <u>Id.</u> ¶ 8. Bryant and Moore

are African-American females, and Anderson, Lowry, and Mulgrew are Caucasian males. Id. ¶¶ 4, 6, 8, 9.

Plaintiff was hired as a probationary counselor for his first three years at Freedom, pursuant to Virginia Code § 22.1-303, which provides that if an employee's performance evaluation during the probationary period is not satisfactory, the school board "shall not reemploy [that employee]." Id. ¶ 12. During each school year, plaintiff received both a mid-year evaluation and an end-of-year summary evaluation. For his first two years, plaintiff received a "meets standards" rating in each of his evaluation categories, id. ¶ 14; however, during plaintiff's second year, problems began to arise as reflected in his January 2015 mid-year evaluation, in which Anderson observed that plaintiff's reluctance to allow students to drop courses "has at times created tension with other staff." Id.; see also Pl.'s Dep., Ex. 6.[1] He was particularly concerned about plaintiff's negative interactions with co-workers, including his sending disrespectful emails and his confrontations with other staff members.

As a counselor, plaintiff was responsible for advising students whether certain courses, such as Advanced Placement ("AP") classes, were appropriate for them, assigning student class schedules, and changing those schedules in consultation with the students' parents and teachers, as well as considering his own professional judgment. Freedom had an open enrollment policy for AP classes, meaning that if a student passed the previous year's AP exam, he or she was eligible to take the next level AP course. Stip. Facts ¶ 17; Pl.'s Dep. 154:2-155:1

According to plaintiff, he had an on-going "rift" with Freedom's Social Studies Department, particularly with one teacher, Blake Nicolai ("Nicolai"), regarding his willingness to let students drop classes or change their schedules. See Pl.'s Dep. at 136:8-138:4 [Dkt. No. 32-

---

[1] Plaintiff still received "meets standards" in all categories for the 2015 mid-year evaluation.

2]. Plaintiff believed that the number of schedule change requests from the Social Studies Department were the result of teachers in that department wanting to boost their own evaluations and class scores at the expense of students' education. Pl.'s Dep. 173:6-175:2. He also believed that the teachers in that department were conspiring to have students and parents complain about him when he refused to make schedule changes. See Pl.'s Ex. 4-6 [Dkt. No. 37-1].

It is uncontested that plaintiff refused to change a number of student schedules on the basis that he did not believe that the proposed reason for the change was sufficient and that such a change would be unfair to other students. The record shows that he explained to Darrin Lowry ("Lowry"), Freedom's assistant principal, that he would not support a change that might be harmful to a student. Id. Ex. 4-16. He offered to refer any requests from the Social Studies Department to Bryant. Id. Plaintiff acknowledged in his deposition that, on at least one occasion, he refused a parent's request to enroll her student in an AP class despite Freedom's open enrollment policy, Pl.'s Dep. 159:2-163:6, and that when he was asked about this refusal, he argued that the parent's request was made only because she was "coached by Ms. Nicolai," id. He admitted that he could not produce any evidence to support that belief and conceded that it was merely his own "reasonable assumption." Id. 159:2-162:14; 163:7-164:7.

The record also shows that thirteen separate complaints were filed about plaintiff, the majority concerning plaintiff's interaction with students and the Social Studies Department's staff. See Pl.'s Dep., Ex. 7; Bryant Dep. at 18:14-22. One parent complained that plaintiff had told her that her child was "not good enough" for AP classes, and that plaintiff's tone in emails to colleagues and parents was "aggressive" "unprofessional," "arrogant," and "disparaging." See Def.'s Ex. C; Pl.'s Dep. at 211:10-212:19. Plaintiff acknowledged during his deposition that parents and other teachers in the school complained about him not granting schedule changes, but again speculated that these complaints were fabricated. Pl.'s Dep. at 144:9-20.

In June 2015, Rebekah Schlatter, PWCPS's Supervisor of Secondary Counseling, recommended that Bryant and Anderson meet with plaintiff to discuss the "tone of his emails and professional relationships with staff." See Def.'s Ex. C. Ms. Schlatter advised that if plaintiff's behavior did not improve, the school would need to issue him a Memo of Concern, a Letter of Reprimand and/or a Performance Improvement Plan. Id. She also suggested that if plaintiff "continue[d] to struggle with his professional behavior" he should receive an "approaching or does not meet [standards] in professionalism" at his next mid-year evaluation. Id.

Although Bryant and Anderson met with plaintiff to discuss the complaints against him, he responded by discounting the complaints, explaining that he believed Nicolai had "got[ten] all the female white teachers in her department . . . to write these statements" and "make up lies about [plaintiff]." Pl.'s Dep. at 173:6:175:6. He maintained that two teachers in the Social Studies Department told him that they were instructed to "write negative things about" him. Id. at 175:7-14. He believed that these complaints were discriminatory because all of the complaints came from white women:

> Q. [I]s it your position that because they were white women.
> A. Uh-huh.
> Q. Their complaints about you were discriminatory or motivated by discrimination?
> A. Oh, yeah, definitely. Of course. That's what happens.

Pl.'s Dep. at 172:11-21. He also reported that at least four students had been asked by Nicolai or another teacher to write statements about any negative interaction they had had with plaintiff. Based on this meeting, Bryant and Anderson recommended that plaintiff have more face to face or phone conversations with colleagues instead of using email to protect plaintiff "against misinterpretation of emails relative to 'tone' and 'intention.'" Pl.'s Dep., Ex. 7; Bryant Dep. at 52:19-53:8.

Bryant also investigated plaintiff's allegations against Nicolai, speaking with the students he had identified. Def.'s Ex. E. The students agreed that they had been asked by Nicolai or other teachers to write statements documenting negative interactions with plaintiff. Id. For example, one student explained to Bryant that Nicolai and another teacher had asked her to write a letter to the principal stating that "Mr. Yeboah and all of guidance was setting her up to not be able to graduate." Id. Bryant reprimanded Nicolai for acting inappropriately by encouraging teachers and students to complain about plaintiff, and recommended that Nicolai refer to an administrator any student problems related to schedules, a counselor or the guidance department as a whole. See Def.'s Ex. E. Bryant also recommended that Nicolai conduct more face to face or phone conversations to avoid misinterpretation of email "tone, intention and assumption." Id.

On June 29, 2015, plaintiff emailed Mulgrew and Dr. Walts ("Walts"), PWCPS' Division Superintendent who is a Caucasian male, and other members of the school board to complain about Nicolai and Lowry. Def.'s Ex. F. He accused Lowry and Nicolai of encouraging students and teachers to fabricate complaints about him, and requested that PWCPS investigate any complaints that had been filed to ascertain whether they were true and requested official reprimands be issued against Nicolai and Lowry. Id. Then in July 2015, he submitted a complaint to the Virginia Department of Education ("VDOE"), repeating his complaints and claiming his alleged mistreatment was the result of discrimination. Pl.'s Ex. 5-17; 6-12. The VDOE investigated, but concluded that plaintiff had not exhausted his administrative remedies within the school, and encouraged him to direct his complaints to the PWCPS school board. Id.

In September 2015, at the beginning of his third probationary year, plaintiff met with Mulgrew and Bryant to discuss his allegations about co-workers, and to address another student schedule change problem. See Pl's Dep., Ex. 8. Both parents of one student had requested that their child be moved from a class due to a discipline incident where one student choked another.

Id. Plaintiff did not feel that the student's behavior warranted a change, but Anderson, Mulgrew, and Ms. Holland (another former assistant principal) had directed him to make the change. See id. Plaintiff nevertheless refused to make the change, believing it was "illegal." The change was eventually made by Anderson. Id. Mulgrew reminded plaintiff that if he did not follow a directive from an administrator, his conduct could be perceived as insubordination. Id. He emphasized that plaintiff has a right to his opinion about student schedules, but "once [he] receive[s] a directive . . . [he] should comply." Pl.'s Dep., Ex. 10.

Mulgrew also instructed plaintiff that he could not "block" AP course requests if the student met Freedom's criteria for enrollment, but that he was entitled to speak to the parents and student to provide advice. Id. Plaintiff responded that he "had to be able to sleep at night" when he was making decisions for students' futures. He again raised his complaints against Nicolai and Lowry, accusing them of changing student schedules to boost Freedom's test scores and accused Lowry of drinking alcohol at the 2014-2015 prom.[2] He felt his complaints were not being adequately addressed and informed Mulgrew and Bryant that he intended to contact the Virginia Department of Education, and the PWCSB about his concerns.

On September 15, 2015, Moore, Freedom's new Director of Counselling, met with plaintiff to discuss additional complaints about his interactions with students. She presented two student statements, in which one student complained that she was not comfortable talking with Mr. Yeboah because he made comments about her weight, and the other explained that plaintiff told her that her grades were "awful" and made her feel like she did not "deserve" to have her schedule changed. See Def.'s Ex. 11. Plaintiff did not recall making any statements about a

---

[2] Bryant explained that although plaintiff did not attend the prom, she did and that there was no evidence of drinking. Def.'s Ex. 9. Plaintiff admitted his accusation was based entirely on a rumor at the school. See Pl.'s Dep. 338:10-340:3.

student's weight, but acknowledged that he had made the other statement. Id. At his deposition, he admitted believing that Moore was coaching students to make up these complaints, and that she should be reprimanded for "making up those lies." Pl.'s Dep. at 176:3-177:4.

Following this meeting, Moore informed plaintiff that she was issuing a Letter of Concern based on the student complaints and a Letter of Reprimand based on two additional incidents, in which plaintiff "directly defied an administrative directive [which] is classified as insubordination." Pl.'s Dep., Ex. 9. Plaintiff responded that Moore should write a second letter of reprimand for insubordination because he would not sign the first letter. Pl.'s Dep., Ex. 9; Stip. Facts ¶ 19.

The Letter of Concern and Letter of Reprimand were issued on September 29, 2015. Stip. Facts ¶ 20. In the Letter of Concern, Moore advised plaintiff to monitor and improve his interactions with other staff members. Pl.'s Dep., Ex. 11. In the Letter of Reprimand, plaintiff was disciplined for failing to submit a graduation form for a student which "almost placed [the student] at risk for not being able to be designated an August 2016 graduate" and for insubordination for refusing to allow a student to return to a class presentation despite a specific instruction from the administration to do so. Id. Plaintiff was also disciplined for failing to call a parent to discuss a student's schedule despite being given a directive to do so. Id. The letter explained that these failures breached the professionalism standard for PWCPS, constituted insubordination, and warned that if plaintiff failed to address recurring issues with his professionalism or failed to fulfill the responsibilities of his position, Freedom's administration might recommend that his contract not be renewed and that he be dismissed from his position. Id.

According to plaintiff, the facts in the Letter of Reprimand were based entirely on an assumption by Moore. In a letter to the school board and Mulgrew, plaintiff argued that Moore could not produce any evidence that he did not provide the graduation form for the student and

was just "assuming" he did not complete it. Pl.'s Ex. 5-43. With respect to the student plaintiff refused to admit to a class presentation, he argued that the student came back after the class was over, so there was no presentation to which he could return. Id. Finally, he explained that he did try to call the parent as directed, and left a voicemail, which the parent claims not to have received. Id.

He also argued that other staff members made "sexist and xenophobic" statements against him, claiming that Nicolai told Bryant that plaintiff "does not work well with women" because of his culture and called him an "asshole." Bryant Dep. 48:19-49:1. Bryant testified at her deposition that she told plaintiff that it was possible that she and other staff thought he was arrogant because he is a confident, African-American male. Id. 41:1-42:2.

There was an additional incident between plaintiff and Mike Nerenberg ("Nerenberg"), another guidance counselor. On December 3, 2015 a transgender student was waiting in the counselling office for his counselor. Def.'s Ex. G. According to a complaint filed by Nerenberg, plaintiff asked that the student produce a pass to show he was properly in the guidance office, and kept referring to the student as "young lady" despite the student identifying as male. Id. After the student failed to produce a pass, plaintiff threatened to have security called to escort the student back to class. Id. At this point, Nerenberg intervened and escorted the student to his office.

The next day, plaintiff approached Nerenberg in his office and was "emotionally out-of-control, yelling, threatening, trying to intimidate [Nuremburg] and shaking his finger." Id. According to Nerenberg, when he asked plaintiff to leave, plaintiff responded "are you going to make me" Id. At that point, Nerenberg left his own office with plaintiff following him, stating "I thought so" and "You have been warned." Id.

Nerenberg filed a complaint with PWCPS' Office of Risk Management, and emailed Moore and Bryant that he was concerned that plaintiff "may do something rash, hostile, and vindictive, and that he may put me or other coworkers in the office in a position where we will have to defend ourselves." Stip. Facts ¶ 23; Def.'s Ex. I. Based on this complaint, Mulgrew temporarily reassigned plaintiff to another school while PWCPS investigated Nerenberg's complaint. Pl.'s Dep. 86:10-16. Def.'s Ex. J.

On December 9, 2015, plaintiff filed a complaint against Nerenberg, Moore, Bryant, Lowry, Nicolai, and Mulgrew with the Office of Risk Management. Pl.'s Dep., Ex. 13. His complaint alleged that:

- Nerenberg's complaint was false, that Nerenberg is rarely in his office, that various teachers drank on Nerenberg's boat during prom and that Nerenberg brought his dog to school;

- Moore's letters of reprimand and concern were false; Moore did not discipline Nerenberg for not being in his office, and Moore encouraged students to complain about plaintiff;

- Bryant amended his prior year's evaluation, Bryant warned the entire staff against drinking at prom, Bryant did not reprimand Nicolai for having students complain about plaintiff, or reprimand Nerenberg for bringing his dog to school or reprimand Moore for writing "false letters of reprimand" and did not punish staff members who complained that plaintiff "does not work well with women;"

- Nicolai called a parent and asked a student to drop a class; told Bryant that plaintiff was dismissive, spoke negatively about plaintiff and encouraged parents, students and staff to document negative interactions with plaintiff;

- Mulgrew directed Moore and Bryant to discipline plaintiff; called plaintiff combative, improperly wrote about his own accomplishments as an AP teacher in a summary of conference and that Mulgrew wrongly claimed to know plaintiff well.

See Pl.'s Dep, Ex. 13.

The same investigator, Mr. Glenn Cash, was assigned to investigate both plaintiff's and Nerenberg's complaints. Over the next few months, he interviewed numerous witnesses,

including plaintiff, Moore, Bryant, Nerenberg, Johnson, Lowry, Nicolai, Mulgrew, and other teachers as well as students, including the transgender student. See Def.'s Exs. K, L. In January 2016, Cash issued a final report on Nerenberg's complaint, concluding that his complaint was substantially supported by the evidence and interviews. Id. Def.'s Ex. K. Nonetheless, PWCPS deemed Nerenberg's complaint "unfounded," but advised plaintiff that it may require internal follow-up from Freedom's principal or associate superintendent. Pl.'s Dep., Ex. 14. Plaintiff was then allowed to return to Freedom and resume his position. Stip. Facts ¶ 27.

While the investigation into plaintiff's complaint was ongoing, in February 2016, Moore and Bryant issued a Letter of Concern to both plaintiff and Nerenberg regarding the incident involving the transgender student. The administrators found that both plaintiff and Nerenberg's demeanor and verbiage were deemed "hostile and aggressive" and that the situation "could have been stated in a more professional manner." Pl.'s Dep., Ex. 21; Def.'s Ex. M. The memo stated that "[a]ny repetition of his behavior . . . if not corrected, could result in additional disciplinary action, up to and including a recommendation for nonrenewal or dismissal. Pl.'s Dep., Ex. 21; Def.'s Ex. M.

At plaintiff's mid-year evaluation in February 2016, he was found to have not met PWCPS' standards in three categories: instructional delivery, learning environment, and professionalism. Stip. Facts ¶ 30. Moore placed plaintiff on three Professional Improvement Plans ("PIPs") to help him improve. Pl.'s Dep., Ex. 22. Moore assigned plaintiff to work with James Jackson, another African-American counselor, as a mentor. Stip. Facts ¶ 34.

Although plaintiff did not object to the PIPs, on March 2, 2016, he responded to an email from Ms. Moore following up on his progress saying "I have not read the PIP nor do I plan to read the PIP nor do I plan on engaging in any PIPing activities because it is the result of a persecutory evaluation." Stip. Facts ¶ 32; Pl.'s Dep., Ex. 20. Moore met with plaintiff on March

9, 2016 to collaborate on the PIPs but plaintiff refused to do so. Stipl. Facts ¶ 33; Pl.'s Dep. at 288:12-289:5 ("We met – one of the days she wanted me to come collaborate and I told her I had nothing to add because I hadn't done anything wrong. So the PIP was all her – all her initiative, her directives, blah blah blah."). Plaintiff believed that he was assigned to Jackson, who is also African-American, to cover up discrimination. Pl.'s Dep. 293:18-22.

On March 10, 2016, Cash finalized his investigation into plaintiff's complaint with the Office of Risk Management and issued a report, concluding that "[n]othing garnered during [his] investigation appeared to provide merit to any of [plaintiff's] claims." Def.'s Ex. L. Cash found that plaintiff's supervisors "appear to have treated [plaintiff] as they would any other employee" and "the majority of information provided by plaintiff at the onset of the investigation proved to be incomplete or not factual." Id.

On April 4, 2016, Moore and Bryant met with plaintiff to provide him a summary evaluation in which they found that he was not meeting standards in three categories and informed him that they intended to recommend that his contract not be renewed. Stip. Facts ¶ 39; Pl.'s Dep. Ex 24. Mulgrew agreed with this recommendation and on April 5, 2016, Dr. Walts informed plaintiff that he, as superintendent, intended to recommend to the School Board that plaintiff's contract not be renewed "based on performance concerns." Stip. Facts ¶ 36; Pl.'s Dep., Ex. 23.[3]

In response, plaintiff supplemented his original Office of Risk Management complaint with claims of discrimination. Def.'s Ex. N. In response, the investigator asked Bryant and Moore further questions related to the new allegations, and concluded that there was no evidence of discrimination. Based on this report, PWCPS' Equity and Compliance Officer informed

[3] Neither Bryant nor Moore have the authority to directly terminate plaintiff. See Johnson Dep. 120:6-7.

plaintiff that his complaint "failed to state a claim of improper conduct" and that "the allegation of differential treatment was deemed unfounded. The examples [of disparate treatment cited by plaintiff] involved employees who were not similarly situated and/or there was no differential treatment based on race or any other suspect class." Pl.'s Dep., Ex. 29.

Plaintiff also appealed his summary evaluation. Pl.'s Dep., Ex. 25. PWCPS assembled a three-member panel to review the appeal, and gave plaintiff an opportunity to present evidence in support of changing the evaluation. Id. Ex. 26. After consideration the panel recommended that PWCPS uphold the initial decision that plaintiff was not meeting standards. Id. Before the recommendation could be finalized or plaintiff's contract not be renewed, plaintiff resigned from his employment on May 25, 2016. Stip. Facts ¶ 47.

## II.    DISCUSSION

### A. Standard of Review

A party is entitled to summary judgment if the party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In general, bare allegations or assertions by the nonmoving party are not sufficient to generate a genuine dispute; instead, the nonmoving party must produce "significantly probative" evidence to avoid summary judgment. Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 929-30 (4th Cir. 1990) (quoting Anderson, 477 U.S. at 242). That being said, in ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in the nonmovant's favor. Anderson, 477 U.S. at 255.

B. Analysis

Plaintiff has sued PWCPS alleging various violations of Title VII, including gender discrimination (Count I), sexual harassment (Count II), racial discrimination (Count III), national origin discrimination (Count IV), and retaliation (Count V), as well as a claim of intentional infliction of emotional distress (Count VI). In each of his discrimination claims, plaintiff asserts that he was the victim of discriminatory discharge, disparate treatment, and hostile work environment and asserts each as a theory of recovery.

1. **Title VII Claims**

A plaintiff can establish a Title VII violation in two ways: (1) through "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue" or (2) through the burden-shifting method of McDonnell Douglas. See Foster v. Univ. of Maryland–Eastern Shore, 787 F.3d 243, 249 (4th Cir. 2015). In the absence of direct evidence of discrimination, the plaintiff bears the initial burden to prove his prima facie case with a set of facts that would enable a fact-finder to "conclude with reasonable probability that in the absence of any further explanation, the adverse employment action was the product of . . . discrimination." Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993). If the plaintiff establishes the elements of a prima facie case, the burden shifts to the defendant to produce evidence showing a legitimate, nondiscriminatory reason for its adverse employment action and, if defendant can do so, then the burden shifts back to the plaintiff to show that this reason was pretextual. Foster, 787 F.3d at 250. Here, plaintiff has raised three distinct Title VII claims: race, gender, and national origin discrimination; sexual harassment; and retaliation.

   a.  Count I, II, III, IV –Discrimination

Plaintiff alleges three separate theories of discrimination: discriminatory discharge; disparate treatment, and hostile work environment based on his gender, race and/or national

13

origin. The Board argues that plaintiff cannot establish a _prima facie_ case under any of these theories, and alternatively, even if plaintiff could make out a _prima facie_ case, there is a legitimate, nondiscriminatory reason for his termination.

As a threshold matter, there is no direct evidence of discrimination. The only statements that could possibly be construed as evidence of discrimination are Bryant's testimony that she remembered Nicolai telling her that plaintiff had a "hard time working with women" and that it was a "cultural thing," Bryant Dep. 48:19-22, Bryant's testimony that she and other staff "possibly" thought that plaintiff was arrogant because he was a "confident African American male," id. 42:16-22, and the declaration from a former student stating that Nicolai called plaintiff an "asshole," see Pl.'s Ex. 4-24.

Even taking all inferences in plaintiff's favor, these comments are insufficient to establish discriminatory animus or hostile work environment based on plaintiff's gender, race, or national origin. The Fourth Circuit has defined direct evidence as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir.1995); see also Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir.1989) (stray remarks unrelated to decisional process are insufficient to demonstrate that the employer relied on illegitimate criteria). Moreover, there is no evidence that any comments identified by plaintiff influenced the decision to recommend that PWCSB not renew his contract.

Specifically, the statements by Nicolai, regardless of her intent, were not made by a decision-maker. Under Title VII, it is the decision-maker's intent that is crucial. Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 301 (4th Cir. 2010); see also Alamjamili v. Berglund Chevrolet, Inc., 2011 WL 1479101, at *11 (W.D. Va. April 18, 2011) (collecting cases finding that even deplorable and discriminatory comments by non-decision makers are not relevant to a

Title VII inquiry). Here, plaintiff has failed to adduce any evidence that Nicolai's comments had any impact on the reprimands or discipline that plaintiff received.

Further, Bryant's statement about plaintiff being arrogant is insufficient to constitute direct evidence of race, gender or national origin discrimination. First, it is unclear when that comment was made. According to plaintiff, it allegedly occurred during a meeting in mid-August 2014, which was the second year of his employment. See Bryant Dep. at 39:7-13. That would have been nearly a year and a half before he received a negative evaluation and the decision was made not to renew his contract. Such a break in time undermines any argument that there is a nexus between the comments, even if facially discriminatory. See McCray v. Pee Dee Reg'l Transp. Auth., 263 F. App'x 301, 306 (4th Cir. 2008). Moreover, plaintiff admits that the comment occurred after Bryant "thanked [him] for his contract" and was giving him advice on how to perform better. Bryant Dep. 39:13-40:4. Bryant's testimony explains that she believed it was because she viewed plaintiff as "very confident and sure of [himself]," which she thought of as a "positive." Ex. 2 – Bryant Dep. at 41:18-42:2, 55:3-56:9. Rather than having a discriminatory animus, these comments appear to have been directed at helping plaintiff.

Finally, plaintiff admits that Nicolai calling him an "asshole" has no relevance to any protected classification and is therefore not evidence of discriminatory animus. Pl.'s Dep. 154:11-16; Stip. Facts ¶ 42. Because plaintiff has failed to adduce any direct evidence of discriminatory animus, his claims must be analyzed under the McDonnell-Douglas framework.

## i. Discriminatory Discharge[4]

To prove a _prima facie_ case of discriminatory discharge, plaintiff must show that (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) despite his satisfactory performance he was discharged; and (4) the position remained open to similarly qualified applicants or was filled by a person outside of the protected class. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); Siraj v. Hermitage in N. Va., 51 F. App's 102, 109 (4th Cir. 2002). "The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).

Although plaintiff has satisfied the first element of a _prima facie_ case,[5] he cannot establish that he was performing his job satisfactorily at the time of his discharge. Despite plaintiff receiving satisfactory evaluations for his first two years at Freedom, it is undisputed that there were numerous complaints from parents, teachers, and students and he does not dispute that he was counselled about multiple student, parent, and teacher complaints during his final year at Freedom. Stip. Facts ¶ 17. Further, plaintiff does not dispute that he was issued an official reprimand for failing to follow directives from his supervisors and failing to comply with Freedom's AP open enrollment policy. Id. ¶ 18. It is also undisputed that there were multiple conferences to address plaintiff's unprofessional conduct, resulting in two letters of concern being issued to him and a formal letter of reprimand being placed in his file. See Def.'s Exs. I;

---

[4] Although plaintiff resigned from his position, the parties have treated his resignation as a constructive discharge given the defendant's decision not to renew plaintiff's employment contract.

[5] There is no dispute that plaintiff, as an African-American male of West Ghanan origin, is a member of three protected classes. Although he is a male, it is not impossible for men to be considered a protected class on the basis of gender under Title VII. See, e.g., Telep v. Potter, 2005 WL 2454103, at *6 (E.D. Va. Sept. 30, 2005).

Pl.'s Dep., Ex. 18-22. Plaintiff does not dispute that he was placed on three separate PIPs designed to remedy these performance issues, and that he refused to collaborate on or comply with the steps recommended in the PIPs. Id. ¶¶ 32-33. This conduct fully supports the conclusion that plaintiff was not performing his job satisfactorily.

Additionally, when plaintiff appealed his evaluations and the decision not to renew his contract, a three-member panel reviewed plaintiff's evaluation, conduct and performance, and provided him an opportunity to present evidence about his performance. The panel independently decided to uphold the finding that he was not meeting PWCPS standards and that his contract should not be renewed. Pl.'s Dep., Ex. 26. Such independent review cuts strongly against any finding of discrimination as the basis for Freedom's administrative decision. See Skrobiszewski v. Commonwealth of Virginia, No. 2:13cv599 (E.D. Va. 2015).[6]

Plaintiff responds that all of the complaints against him were "fabricated" or the result of discrimination; however, he has produced no evidence to support these claims. Throughout his deposition, he admitted that he had no evidence on which to base his allegations, and believed that he did not have to produce such evidence until the case went to trial. See Pl.'s Dep. at 106:11-18; 197:14-199:5; 218:3-4; 302:6-10. Moreover, the evidence plaintiff did submit in opposition to summary judgment consists almost entirely of his own emails and complaints. See generally [Dkt. No. 37-1]. Where there is no evidence of discrimination other than a plaintiff's own "bare assertions" summary judgment is appropriate. Mann v. First Union Nat'l Bank, 185 F. App'x 242, 248 (4th Cir. 2006); Wright v. Arlington County, VA, 2004 WL 3059544, at *2

---

[6] It is also undisputed that a number of the decision makers share plaintiff's protected classifications. Dr. Walts, Anderson, Lowry, and Mulgrew are male; Bryant and Moore are African-American. This cross-section of protected classifications further suggests that no discrimination occurred. See Demesme v. Montgomery Cty. Gov't, 63 F. Supp. 2d 678, 683 (D. Md. 1999), aff'd per curiam, 208 F.3d 208 (4th Cir. 2000).

(E.D. Va. Mar. 1, 2004) (finding that a plaintiff's own assertions were insufficient to establish a prima facie case of gender discrimination). Because plaintiff has not demonstrated his job performance was satisfactory, he has not established a prima facie case of discriminatory discharge. Even if he had made out a prima facie case, he has failed to produce any evidence that the reasons given for the disciplinary actions were pretext for unlawful discrimination. For these reasons, his claim of being the victim of discriminatory discharge on the basis of race, gender, or national origin fails.

ii.    Disparate Treatment

To prevail on a disparate treatment theory, plaintiff must show that (1) he is a member of a protected class; (2) his performance was satisfactory; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably. Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

For the reasons discussed above, this claim also fails because plaintiff cannot establish that his job performance was satisfactory. Furthermore, plaintiff cannot satisfy the fourth element because the individuals whom he claims PWCPS treated more favorably than him are not proper comparators. Here, plaintiff claims that Nerenberg, Nicolai, and Ellen Pierce, Freedom's registrar, were all treated more favorably than him.

In evaluating similarly-situated comparators, employees are similarly situated if they are similar in all relevant respects. Bateman v. American Airlines, Inc., 614 F. Supp. 2d 660, 674 (E.D. Va. 2009). It is undisputed that plaintiff was a probationary employee and that all the employees he identifies as receiving disparate treatment were continuing contract employees. See Def.'s Opp. at 20. This distinction alone undermines plaintiff's claim of disparate treatment. See Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000) (finding that probationary and non-probationary employees are not similarly situated). Moreover, plaintiff has not shown that these

employees were the subject of similar complaints, discussions of poor performance, or workplace disputes by anyone other than plaintiff himself. Instead, the misconduct plaintiff alleges as to Nerenberg and Nicolai was that they were allegedly drinking at prom; and that Nerenberg brought a dog to school and was rarely in his office. Pl.'s Opp. at 13. These types of distinct offenses, supported by no evidence other than plaintiff's allegations, do not establish that either Nerenberg or Nicolai are proper comparators under Title VII. See <u>Lightner v. City of Wilmington</u>, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").

Similarly, he claims that he was reprimanded for not filing a graduation report for a student, while Pierce, who also handles these forms, was not reprimanded. Pl.'s Opp. at 8. He claims the reprimand was based on an assumption rather than any evidence. The record does not support plaintiff's position. Moore reprimanded plaintiff because he did not turn in a form that was necessary for a student to be designated as a summer graduate, <u>see</u> Pl.'s Dep., Ex. 12, and when questioned, she has explained that it was the counselor's responsibility to provide the form to the registrar. During her investigation, Moore found that Pierce did not have a copy of the form, and plaintiff was unable to produce any evidence that he had provided her with a copy. Moore Dep. at 38:5-41:18. Moore's "assumption" was that, because no copy of the document could be found, the employee with responsibility for creating it had erred. <u>Id.</u>

Even if plaintiff could establish that the three other employees are proper comparators, he still cannot establish a <u>prima facie</u> case of disparate treatment. He argues that PWCPS did not properly discipline or investigate his allegations against Nerenberg, Nicolai, or Pierce. Yet, the uncontroverted evidence shows exactly the opposite. Bryant investigated and disciplined Nicolai for her actions encouraging students to complain about plaintiff. <u>See</u> Def.'s Ex. E. Nerenberg received the same Letter of Concern as plaintiff regarding the incident with the transgender

student. Id. Ex N. Similarly, both Nerenberg and plaintiff submitted complaints regarding the altercation in the guidance office, and the Office of Risk Management fully investigated and deemed both complaints unfounded. The evidence shows that each employee was subject to a similar level of treatment and discipline as plaintiff when accused of similar unprofessional conduct. See Soon Yoon v. Sebelius, 481 F. App'x 850-851 (4th Cir. 2012) (finding that although the employee identified four Caucasian employees "who allegedly engaged in some degree of misconduct," none were proper comparators because none of them "engaged in a heated argument," were "insubordinate," or "had any history of misconduct or had received previous reprimands," as had the employee).

Plaintiff alternatively argues that these individuals should have received greater discipline, but relies solely on his own appraisal of their conduct. As a matter of law, a plaintiff's subjective interpretation of what would constitute proper treatment is irrelevant in this context. DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000) (finding that opinions of co-workers are "close to irrelevant."). Plaintiff cannot prove that other employees were engaged in similarly serious conduct and received any different treatment. Therefore, his claim for disparate treatment fails.[7]

---

[7] In his opposition, plaintiff also argues that Bryant failed to discipline Ms. Holland, an assistant *principle*, or Mariely Correa, a staff member at Freedom, for allegedly disparaging his culture and nationality, Pl.'s Opp. at 13; however, he does not identify what statement Holland made, and does not point to any record evidence showing Correa's alleged comment that "plaintiff does not work well with women" ever occurred. Without more, these new allegations are insufficient to create a genuine dispute of material fact sufficient to survive summary judgment.

### iii. Hostile Work Environment[8]

To establish a Title VII claim of a hostile work environment, plaintiff must show that (1) he was subjected to unwelcome conduct; (2) the unwelcome conduct was based on one or more protected classifications; (3) the conduct was sufficiently pervasive or severe to alter the conditions of employment; and (4) a basis for imputing liability to the employer. Smith v. First Union Nat'l Bank, 202 F.3d 234, 241-42 (4th Cir. 2000); Boyer–Liberto v. Fontainebleau Corp., 786 F. 3d 264, 277 (4th Cir. 2015). The "unwelcome conduct" must be based on plaintiff's membership in a protected class. Monk v. Potter, 723 F. Supp. 2d 860, 880 (E.D. Va. 2010). Title VII does not protect employees from hostility or abuse unless the objectionable conditions occur because of a protected characteristic. Graham v. Prince George's County, 191 F. App'x 202, 204 (4th Cir. 2006). This is essentially a "but for" test. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). Here, plaintiff cannot establish either the first or third element.

The majority of plaintiff's allegations centers on the complaints against him and the way PWCPS handled investigations into his own complaints against other staff members. See Pl.'s Opp. at 3-8. He does not produce any evidence that there were overt remarks referencing his race, gender, or national origin directed at him. Moreover, he fully admits that the few comments he has identified occurred years before the discipline he faced. See, e.g., Pl.'s Opp. at 14 (Nicolai stated that plaintiff does not work well with women in September 2013).

---

[8] Count II alleges that defendant created a hostile work environment because of sexual harassment, see Compl. ¶ 59; however, he fails to establish even the most basic element of a sexual harassment claim. He has produced no evidence that anyone, supervisor or colleague, made any unwelcome sexual advance or comment to him, nor does his complaint make any factual allegation of unwelcome sexual conduct. Indeed, at his deposition, he conceded that no one had ever made a sexual comment to him and explained that this claim was because Moore "on at least two occasions" insisted that "because he was a man, he lacked the ability to show compassion toward students." Pl.'s Dep. 103:2-104:21. This type of comment does not constitute the type of "unwelcome sexual advance[s]" that would give rise to a claim of sexual harassment. See Hoyle v. Freightliner, LLC, 650 F.3d 321, 331 (4th Cir. 2011).

Instead, plaintiff accuses his supervisors of creating a hostile work environment by calling him "combative" and not "compassionate," Pl.'s Opp. at 12, but fails to provide any evidence that race, gender, or national origin factored into these comments. Indeed, the record shows that these comments were based on plaintiff's conduct (arguing with colleagues, inappropriate comments to students, parent complaints, insubordination) rather than plaintiff's protected classifications. See Combs-Burge v. Rumsfeld, 170 F. App'x 856, 852 (4th Cir. 2006) (finding that evidence that a supervisor "criticized, micro-managed" and "nit-picked" an employee is not sufficient to maintain a hostile work environment claim).

Plaintiff also accuses PWCPS of various slights, none of which rise to the level required to create a hostile work environment. Among these are plaintiff's claims that Nicolai once called him on behalf of another teacher in contravention of policy, that Holland cursed in his presence, that Nicolai and other teachers gossiped about him, and that Moore told Plaintiff he needed to be more compassionate. Pl.'s Opp. at 14-15. Although he again references Bryant's comment that some people might think plaintiff arrogant because he is a "confident, African American male," Bryant's testimony explained that she made that statement because she viewed plaintiff as "very confident and sure of [himself]," which she thought of as a "positive." Ex. 2 – Bryant Dep. at 41:18-42:2, 55:3-56:9. None of these allegations is sufficient to make out a claim of hostile work environment because there is no evidence that they were based on plaintiff's protected characteristics. Dawson v. Rumsfeld, 2006 WL 17305 (E.D. Va. Feb. 8, 2006) ("A review of the Fourth Circuit's decisions on the subject reveals that the type of conduct necessary to state a hostile work environment claim involves racially offensive remarks or other overt racially insulting conduct.").

Even assuming these types of statements and allegations could constitute harassment or discrimination, none of the conduct was sufficiently severe to create a hostile work environment.

At most, plaintiff identifies a few isolated incidents over a nearly 3-year period. The Supreme Court "has stressed that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' " Boyer–Liberto, 786 F.3d at 298–99 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Regardless of the appropriateness of these types of comments or interactions, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008). Plaintiff's disagreement with the way PWCPS handled his complaints or disciplined other employees is not sufficient to establish liability. See id. (finding that complaints that are premised on "nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict" do not satisfy the severe or pervasive standard). Thus, plaintiff has not established a prima facie case of a hostile work environment.

   b.  Count V – Retaliation

Plaintiff's final Title VII claim is for retaliation. He claims that his contract was not renewed because of his complaints about Freedom's administrators. To make out a retaliation claim under Title VII, plaintiff needs to show (1) that he engaged in protected activity; (2) that an adverse employment action was taken against him; and (3) that there is a causal link between the protected activity and the adverse employment action. Coleman, 626 F.3d at 190. To establish causation, a plaintiff must show that "but for" his protected activity, the employer would not have taken the adverse action. See Kirkland v. Mabus, 206 F. Supp. 3d 1073, 1084 (E.D. Va. 2016). Defendant does not dispute that plaintiff suffered an adverse employment action or that he engaged in protected activity by filing his complaint with the Virginia Board of Education and the Office of Risk Management, but contends that there is no causal nexus between the two.

Defendant's argument is correct. Plaintiff cannot demonstrate that PWCPS would have renewed his contract "but for" his alleged protected activity because the undisputed evidence shows that PWCPS would have terminated plaintiff even in the absence of his complaints. His unprofessional conduct, admitted insubordination, and deficient performance was well documented. Indeed, as early as January 2015, Anderson expressed concerns about plaintiff's unprofessional conduct and negative interactions with other Freedom staff members. See Def.'s Ex. 6. Plaintiff does not dispute that there were multiple complaints filed against him by teachers and parents throughout 2015, that the school reprimanded him for insubordination, and that he was placed on three PIPs that he did not fulfill. Moreover, under Virginia law, PWCPS was under no obligation to renew plaintiff's contract even if he had been meeting performance standards. Va. Code Ann. § 22.1-303(A).

Plaintiff's only evidence that his contract was not renewed "because" he complained is an email exchange on December 4, 2015 between Amy White, PWCPS' Director of Human Resources, and William Reid, director of the Office of Risk Management about plaintiff which states "[t]his is a very complicated issue. Complaints from [plaintiff] to school board, BOCS, superintendent staff. Mulgrew was out but no resolution. Should be nonrenewed." Def.'s Reply, Ex. A [Dkt. No. 42-1] (emphasis added). Plaintiff incorrectly argues that this single line establishes the requisite causation. As the record shows, this email exchange was in response to a question about the role the principal (Bryant) had in resolving the December 3, 2015 incident between Nerenberg and plaintiff. See id. The full exchange shows that White was explaining why plaintiff's complaint was a complicated issue, not that plaintiff should be non-renewed for complaining.

There is no evidence that these comments between two non-decision makers had any impact on the decision not to renew plaintiff's contract, which was made by Bryant, Moore,

Mulgrew, and Dr. Walts, all of whom recommended that plaintiff's contract not be renewed based on his documented performance problems. As the record demonstrates, there had been problems with plaintiff's conduct months before he made any official complaints. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise. Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006).

Furthermore, although plaintiff complained to Freedom's administration about the requests from the Social Studies Department to change student schedules, his concerns about Freedom's policies for schedule changes, other teachers' alleged drinking, and his belief that allegations against him were fabricated, see e.g. Pl.'s Exs. 4-6; 4-9; 5-3, these types of complaints are not "protected activity" within the ambit of Title VII, see Davis v. Globalphone Corp., No. 1:05-cv-187, 2005 WL 2708921, at *6 (E.D. Va. Oct. 19, 2005) ("Where a complaint merely concerns conduct not prohibited by Title VII, such is not 'protected activity.'" (citing Balazs v. Liebenthal, 32 F.3d 151, 159-60 (4th Cir.1994))). Instead, plaintiff's first complaint raising claims of discrimination on the basis of his race or gender appears to be in July 2015, when plaintiff contacted the Virginia Department of Education. See Pl.'s Ex. 5-20; 5-41. Plaintiff also alleged discrimination in his December 9, 2015 complaint to the Office of Risk Management. Def.'s Ex. L.

Bryant and Lowry met with plaintiff on June 10, 2015 to discuss parent and teacher complaints against him and plaintiff's lack of professionalism. See Pl.'s Dep., Ex. 6, and on June 15, 2015, Ms. Schlatter, the superintendent for guidance, instructed Anderson and Bryant to discipline plaintiff for his failure to follow administrative directives. That same line of discipline continued throughout the year, until Bryant and Moore recommended that plaintiff's contract not

be renewed in March 2016. Thus it was at least 3 months and at most 10 months, between any

protected activity by the plaintiff and the adverse employment action.[9]

This substantial gap in time "weighs against a finding that it is more likely than not that

the alleged protected activities played a role in [plaintiff's] termination." Feldman v. Law Enfor't

Assoc. Corp., 752 F.3d 339, 348-49 (4th Cir. 2014). Numerous courts have found that without

evidence demonstrating a causal nexus, a gap of two to three months is too long to infer a link

between protected activity and an adverse employment action. See, e.g. King v. Rumsfeld, 328

F.3d 145, 141 n.5 (4th Cir. 2003); Swann v. U.S. Foods, Inc., 2015 WL 3793739, at *6 (E.D. Va.

June 17, 2016) (a period of three months between protected activity and adverse action is

insufficient to establish a causal link).

Plaintiff argues that his "Exhibit 4-12 through 4-15" establish that he engaged in

protected activity on June 11, 2016, before the Freedom's administration's meeting. Pl.'s Opp. at

16. This argument is unpersuasive and fails to create a genuine dispute of material fact. The cited

exhibit is an undated and unsigned letter which does not contain any information about when it

was written, or if it was even sent and received by PWCPS or any administrator. See Pl.'s Ex. 4-

12 to -15. Moreover, that letter merely repeats plaintiff's complaints about his co-workers and

does not make any allegation of discrimination on the basis of his race, gender, or national

origin. See id. In the letter, he alleges that Nicolai encouraged a student to write a negative

statement about him and was "discrediting [his] professionalism and competence" in front of

students, and that the administration did not properly reprimand Nicolai and other teachers for

drinking at the prom. Pl.'s Ex. 4-12 to -13. The letter also disputes the complaints that the school

---

[9] The letter of reprimand and poor mid-year evaluation cannot be considered an "adverse employment action" under Title VII because plaintiff lost no pay and maintained the same position following the evaluation. See Thompson v. Potomac Electric Power Co., 312 F.3d 645, 650 (4th Cir. 2002).

had received about him. Id. Ex. 4-14. Because nothing in that letter constitutes "protected activity" under Title VII, plaintiff fails to establish a prima facie case of retaliation.

Even if plaintiff could establish his prima facie case, as discussed above, the overwhelming evidence demonstrates that PWCPS had legitimate, non-discriminatory reasons for recommending that plaintiff's contract not be renewed—namely, his unprofessional conduct and insubordination and plaintiff has not submitted any evidence that a reasonable fact-finder could rely to show that these reasons were pretextual.

Plaintiff's only response to defendant's evidence is his argument that his performance was satisfactory, and that any reprimand or disciplinary problem was fabricated against him. This is insufficient to overcome summary judgment. In Hawkins v. PepsiCo, Inc., the Fourth Circuit rejected the argument that a plaintiff's own evaluation could create a genuine issue of fact. 203 F.3d at 280. "It is the perception of the decision-maker that is relevant [to a retaliation claim]." Id. Specifically, the Hawkins court, rejected plaintiff's self-serving evaluation as sufficient to defeat summary judgment because "instead of producing evidence that the [employer's] assessment of performance was . . . not the real reason for her termination. . . plaintiff merely disputes the merits of [defendant's] evaluations." Id. Like the plaintiff in Hawkins, plaintiff's belief that he was meeting his performance standards merely disputes the evaluations given by his superiors. This is not enough to survive defendant's motion.

## 2. Intentional Infliction of Emotional Distress

In Count VI, plaintiff alleges that the treatment he received at Freedom constituted an intentional infliction of emotional distress. Defendant correctly responds that the school board is immune from suit for intentional torts. "In the absence of a statute waving its immunity, a school board is immune from liability arising out of negligence and intentional tort claims." Kellam v. Sch. Bd. of the City of Norfolk, 202 Va. 252, 254 (1960); see also H.H. v. Chesterfield

County School Board, 2007 WL 4246487 (E.D. Va. Nov. 29, 2007). Indeed, Virginia has expressly excluded school boards from the waiver of immunity applied to the state, thus preserving sovereign immunity for school boards. Va. Code. Ann. § 8.01-195.3.

Although there is no immunity for a Title VII claim, Count VI falls outside the ambit of Title VII and must be dismissed. Plaintiff's claim that PWCPS should be liable for this tort because it maintains liability insurance is unavailing because the existence of defendant's liability insurance is inadmissible as any evidence of wrongdoing and is irrelevant to consideration of Count VI. See Fed. R. Evid. 411; see also Langley v. Turner's Express, Inc., 375 F.2d 296, 297 (4th Cir. 1967).

## III.     CONCLUSION

For the reasons discussed above, defendant's Motion for Summary Judgment [Dkt. No. 31] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 29th day of December, 2017

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge